IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 14, 2001

## EDDIE J. PHIFER v. TENNESSEE BOARD OF PAROLE, ET AL.

### Appeal from the Chancery Court for Davidson County
No. 99-2696-III     Ellen Hobbs Lyle, Chancellor

---

### No. M2000-01509-COA-R3-CV - Filed November 1, 2002

---

This is a *pro se* appeal from a denial of parole. Mr. Phifer alleges several problems surrounding his parole hearing that he claims violate his due process and equal protection rights and violate the *ex post facto* constitutional prohibition. Because a prisoner has no liberty interest in release on parole before the expiration of his sentence, due process protections do not attach to parole determinations. Because at the time of Mr. Phifer's crime and conviction, the law regarding parole gave total discretion to the Board and authorized denial if the Board found that parole would depreciate the seriousness of the crime committed, changes in Board procedure do not violate *ex post facto* prohibitions. Because the Board has provided a rational basis for denying in-person interviews for prisoners housed out of state, no equal protection violation was shown. Consequently, we affirm the trial court's dismissal of the petition for failure to state a claim upon which relief may be granted.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

Eddie J. Phifer, Crestview, Florida, Pro Se.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Pamela S. Lorch, Assistant Attorney General, for the appellees, Tennessee Board of Parole, et al.

### OPINION

This case arose when the petitioner, Eddie J. Phifer, a Tennessee Department of Correction inmate housed in a Florida prison, filed a petition for a writ of mandamus and writ of certiorari in the chancery court for Davidson County. He complained about the procedures employed by the Tennessee Board of Probation & Parole in his parole grant hearing. The Board filed a motion to dismiss for failure to state a claim which was granted by the chancery court. Mr. Phifer appeals.

Mr. Phifer has been housed as an inmate in the Okaloosa Correctional Institution in Crestview, Florida since June, 1981. He is in Florida pursuant to the Interstate Corrections Compact. He is serving two consecutive twenty-five year sentences for crimes committed in Tennessee on December 3, 1979: aggravated kidnaping and aggravated rape.

According to Mr. Phifer's complaint, this appeal arises from a number of parole considerations, some of which were the result of successful administrative appeals by Mr. Phifer from earlier hearings and decisions.[1]  According to applicable procedures, when he first became eligible for parole, Mr. Phifer was interviewed by a Florida prison official who recommended parole. A number of months later, he was sent two letters from the Board, each containing the same substantive content of relevance: a hearing summary stating a hearing was held on February 23, 1998, and parole was denied because "release at this time would depreciate the seriousness of the offense or promote disrespect of the law." The next parole review date was set for February, 2003.

Mr. Phifer administratively appealed the first hearing result, and the Board granted his appeal. The Board notified Mr. Phifer that a new non-appearance administrative appeal parole hearing was set and that he should present any written evidence or documentation five (5) days prior to the hearing.  In response Mr. Phifer requested an open hearing to allow family and friends to speak on his behalf; to be able to hire a lawyer to intercede on his behalf; and to be allowed to be present at the hearing.  He later received a letter from the Board and a hearing summary notifying Mr. Phifer that parole was declined because release would "depreciate the seriousness of the crime for which the offender stands convicted or promote disrespect of the law." The letter stated a new parole hearing was set for February, 2003.

Mr. Phifer requested an appeal of this second decision on various grounds, including that he did not receive enough advance notice to provide more information to the Board, the prison had been in a lock down status, and mail was delayed due to Hurricane George.  Subsequently, the Board notified Mr. Phifer that the "administrative appeal hearing is final and cannot be appealed." However, because his case was reviewed inadvertently by Board members who finalized the earlier decision, the Board later notified Mr. Phifer that another non-appearance administrative appeal parole hearing was scheduled and that all supporting evidence and documentation must be submitted five (5) days prior to the hearing.

In response, Mr. Phifer requested a continuance and permission to appear in person or at least for his family to be allowed to be present and speak on his behalf.  Further, he requested a psychological evaluation and consideration of reports of staff members as to his progress. The Board sent him a hearing summary from this third hearing stating that parole was denied because release "would depreciate the seriousness of the crime of which the offender stands convicted or promote disrespect of the law." The next hearing date was set for April, 2005.

---

[1]Because the lower court dismissed Mr. Phifer's claim prior to the record being sent up from the Board, we are limited to the information contained in the Complaint.  Furthermore, the Board does not dispute any of the information contained in the documents attached to the Complaint, and, on a motion to dismiss, we must take such allegations as true.

Mr. Phifer wrote to the Board questioning the change in the next eligible hearing to April, 2005 from February, 2003.  He further argued that he had a right to be present or to a telephonic hearing and to have his family and friends present on his behalf.  The Board sent him notice of another non-appearance parole hearing and again informed him that any information regarding his parole should be submitted five (5) days prior.[2]  Mr. Phifer's mother submitted a letter in support of his parole, and the Board wrote her informing her that a hearing was scheduled for November 29, 1999, and any information regarding this hearing should be submitted five (5) days prior.

The Board later wrote Mr. Phifer and sent a hearing summary reflecting that parole had been denied on the same grounds as expressed earlier and scheduling the next review of his parole for February, 2003.  Thus, the documents included in Mr. Phifer's filing indicate his parole was considered by the Board at least four times.  Each time, parole was denied on the ground that parole would depreciate the seriousness of the crime of which he was convicted or promote disrespect of the law.  Mr. Phifer actually filed his petition for writ of certiorari before he received notice of the November 1999 hearing.  At the time he filed his petition, he was unaware of the results of the immediately prior hearing by the Board.  After this petition was filed, he was notified of the November 1999 hearing and later notified of the Board's decision.  The trial court was informed about these events.  It is the final hearing, resulting in denial of parole, which is the appropriate subject of this appeal.[3]

On appeal, Mr. Phifer's claims are that the parole board's denial of his parole was made pursuant to procedures which violate due process, equal protection, and the prohibition on *ex post*

---

[2]It is not clear from the record before us what triggered the setting of this new hearing.

[3]A petition for common law writ of certiorari from an administrative decision must be filed within sixty (60) days of the order or decision complained of.  Tenn. Code Ann. § 27-9-102.  The sixty (60) day time limit is jurisdictional.  *Thandiwe v. Traughber*, 909 S.W.2d 802, 804 (Tenn. Ct. App. 1994).  This court has held that a Board of Paroles decision does not become final, for purposes of triggering the sixty-day deadline, until the Board renders a decision on the prisoner's appeal.  *Jordan v. Tennessee Bd. of Paroles*, No. 01-A-01-9607-CH-00347, 1997 Tenn. App. LEXIS 27 (Tenn. Ct. App. Jan. 15, 1997) (no Tenn. R. App. P. 11 application filed).  In Mr. Phifer's case, his earlier administrative appeals were successful in that they resulted in new considerations by the Board.  Thus, he received relief from the Board.

*facto* laws.[4] He also alleges he was denied access to the courts because he was denied legal materials and assistance in preparing for his parole hearing.

## I.

Prisoners do not have an absolute right to be released from confinement prior to the expiration of their sentence. *Graham v. State*, 202 Tenn. 423, 426, 304 S.W.2d 622, 623-24 (1957); *Robinson v. Traughber*, 13 S.W.3d 361, 364 (Tenn. Ct. App. 1999); *Tarpley v. Traughber*, 944 S.W.2d 394, 395 (Tenn. Ct. App. 1996). Thus, parole is a privilege and not a right. Tenn. Code Ann. §§ 40-28-117(a), 40-35-503(b); *Arnold v. Tennessee Bd. of Paroles*, 956 S.W.2d 478, 482 (Tenn. 1997). Whether a prisoner should be granted parole is a decision entrusted to the Board, not the courts. *State ex. rel. Ivey v. Meadows*, 216 Tenn. 678, 685, 393 S.W.2d 744, 747 (1965); *Rucker v. State*, 556 S.W.2d 774, 776 (Tenn. Crim. App. 1977).

Persons dissatisfied with the Board's decisions may obtain judicial review using a petition for common law writ of certiorari. This petition limits the scope of review to a determination of whether the Board exceeded its jurisdiction or acted illegally, fraudulently, or arbitrarily. *Turner v. Tennessee Bd. of Paroles*, 993 S.W.2d 78, 80 (Tenn. Ct. App. 1999); *South v. Tennessee Bd. of Paroles*, 946 S.W.2d 310, 311 (Tenn. Ct. App. 1996); *Powell v. Parole Eligibility Review Bd.*, 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994). The petition does not empower the courts to inquire into the intrinsic correctness of the Board's decision. *Robinson*, 13 S.W.3d at 364; *Turner*, 993 S.W.2d at 80. Thus, the courts will not use the common law writ to grant relief when the Board's decision was arrived at in a constitutional and lawful manner. Tenn. Code Ann. § 40-28-115(c); *Arnold*, 956 S.W.2d at 480; *Powell*, 879 S.W.2d at 873.

---

[4]In addition to these claims, Mr. Phifer's original complaint included other alleged grounds for relief. For example, Mr. Phifer originally asserted a complaint that he was not given a psychological examination prior to the parole hearing but abandons that argument on this appeal. We agree with the Board that the evaluation is mandatory and is required only after parole is recommended. *See* Tenn. Code Ann. § 40-28-302(c); *McKinley v. Traughber*, No. 01A01-9804-CH-00205, 1998 Tenn. App. LEXIS 839 (Tenn. Ct. App. Dec. 16, 1998) (no Tenn. R. App. P. 11 application filed).

Additionally, Mr. Phifer alleged that his next eligible release date was extended from February, 2003 to April, 2005 out of vindictiveness of the board members. After one of the hearings denying parole, Mr. Phifer's next parole eligibility hearing was set for April, 2005. In all of the prior hearings it was set for February, 2003. Mr. Phifer requested an administrative appeal of the decision containing the April, 2005 date and it was granted. On the subsequent appeal, this mistake was corrected when the board set the next hearing date back to the original February, 2003. Therefore, this issue is moot.

Mr. Phifer also alleged he had not received the appropriate sentence credits. However, in his reply brief on appeal, Mr. Phifer states "Appellant has presented the jail credit matter previously and does not abandon that issue. The Tennessee DOC has since awarded these credits." Mr. Phifer does not advance any further concerns with the award of those credits. Because he has apparently received from the Department the relief he requested from the courts, this issue is moot. Further, we agree with the Board that the proper party to address an issue of sentence calculation is not the Board but the Department of Correction, who is not a party to this action. Tenn. Code Ann. § 40-28-129.

4

Because no prisoner has a constitutional or inherent right to be conditionally released before the expiration of a valid sentence, *Greenholtz v. Inmates of the Neb. Penal and Corr. Complex*, 442 U.S. 1, 7-8, 99 S. Ct. 2100, 2104 (1979), a prisoner has no constitutionally-protected liberty interest in parole. Tenn. Code Ann. § 40-35-503(b); *Wright v. Trammell*, 810 F.2d 589, 591 (6th Cir. 1987); *Kaylor v. Bradley*, 912 S.W.2d 728, 733 (Tenn. Ct. App. 1995). Without such an interest, due process does not attach.

Consequently, no constitutionally required procedures exist for a hearing on whether to grant parole. We additionally note that Mr. Phifer was sentenced as a Class X felon and, consequently, his consideration for parole is governed by Tenn. Code Ann. §§ 40-28-301 and -302 (repealed 1985). The first of these statutes provides for release eligibility only after the prisoner has served forty per cent (40%) of the sentence actually imposed, including forty per cent (40%) of the combination of consecutive sentences, undiminished by sentence reduction credits. Tenn. Code Ann. § 40-28-302 provides:

> (a) The release classification status for a person convicted of a Class X felony shall be determined by the administrative authority vested by law with authority over pardon, parole, and release recommendations and determinations, and which shall hereinafter be defined as the "authority."

> (b) Release classification is a privilege and not a right, and no person convicted of a Class X felony shall be granted release classification status if the authority finds that:

> > (1) There is a substantial risk that the person will not conform to the conditions of the release program;

> > (2) The release from custody at the time would depreciate the seriousness of the crime of which the persons stands convicted or promote disrespect for the law;[5]

> > (3) The release from custody at the time would have a substantially adverse effect on institutional discipline; or

> > (4) The person's continued correctional treatment, medical care or vocational or other training in the institution will substantially enhance the person's capacity to lead a law-abiding life when given release status at a later time.

Because Mr. Phifer had no right to parole before the expiration of his sentence, we agree with the trial court that he has failed to state a claim of denial of due process.

---

[5]We note the courts have consistently upheld a similarly worded ground applicable to other prisoners, the seriousness of the offense, Tenn. Code § 40-35-503(b)(2). *Arnold*, 956 S.W.2d at 482; *Robinson*, 13 S.W.3d at 363.

II.

Similarly, Mr. Phifer has failed to state a claim based upon the constitutional prohibition against *ex post facto* application of penal statutes found in both the United States Constitution, Article I, Section 10, and the Constitution of Tennessee, Article I, Section 11.[6] The *ex post facto* prohibition is "aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *California Dep't of Corr. v. Morales*, 514 U.S. 499, 504, 115 S. Ct. 1597, 1601 (1995). An *ex post facto* law "changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed." *Weaver v. Graham*, 450 U.S. 24, 32-33, 101 S. Ct. 960, 966 (1981). The critical question in an *ex post facto* claim is "whether the law changes the punishment to the defendant's disadvantage, or inflicts a greater punishment than the law allowed when the offense occurred." *State v. Pearson*, 858 S.W.2d 879, 883 (Tenn. 1993).

Under both state and federal constitutions and cases interpreting them, two factors must be present to establish a violation of the *ex post facto* prohibition: (1) the law must apply retrospectively to events occurring before its enactment; and (2) it must disadvantage the offender affected by it. *State v. Ricci*, 914 S.W.2d 475, 480 (Tenn. 1996); *Pearson*, 858 S.W.2d at 882 (quoting *Miller v. Florida*, 482 U.S. 423, 430, 107 S. Ct. 2446, 2451 (1987)); *Kaylor*, 912 S.W.2d at 732.

Actions which extend parole eligibility by altering the criteria for such eligibility can implicate the *ex post facto* clause because eligibility for parole consideration is part of the law annexed to the crime when committed. *Kaylor*, 912 S.W.2d at 732 (citing *Weaver*, 450 U.S. at 32-33, 101 S. Ct. at 966 (other citations omitted)). As the United States Supreme Court has stated:

> . . . retroactive alteration of parole or early release provisions, like the retroactive application of provisions that govern initial sentencing, implicates the *Ex Post Facto* Clause because such credits are "one determinant of petitioner's prison term . . . and . . . [the petitioner's] effective sentence is altered once this determinant is changed."

*Lynce v. Mathis*, 519 U.S. 433, 445, 117 S. Ct. 891, 898 (1997) (citations omitted).

In the instant case, the analysis of any *ex post facto* implication of Mr. Phifer's claims must begin with Tenn. Code Ann. §§ 40-28-301 and -302, which were part of "the law annexed to the crime" which Mr. Phifer committed in 1979. By their plain words, those statutes put offenders on notice that if convicted of a Class X felony, their release classification status was to be determined by the Board in its discretion and that release on parole was not available if the Board found that such release would depreciate the seriousness of the crime committed or promote disrespect for the law.

---

[6]The interpretations by the United States Supreme Court of the federal constitutional provision and those of the Tennessee Supreme Court of the state constitutional provision are complementary and consistent. *Kaylor*, 912 S.W.2d at 731.

6

Mr. Phifer first challenges the Board's hearing procedures for prisoners held out of state, which he alleges were adopted after his conviction. The provisions of the Interstate Corrections Compact were enacted in 1973 and have not since been amended. Therefore, the application of these provisions has not changed since Mr. Phifer was convicted of aggravated kidnaping and aggravated rape in 1979.

The Board's adoption of procedures to be followed for hearings in absentia does not implicate the *ex post facto* prohibition because such procedures do not increase the punishment for a crime nor do they change the substantive criteria for parole eligibility. "Even if a law operates to the defendant's detriment, the *ex post facto* prohibition does not restrict 'legislative control of remedies and modes of procedure which do not affect matters of substance.'" *Miller*, 482 U.S. at 433, 107 S. Ct. at 2452 (quoting *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S. Ct. 2290, 2298 (1977)).

The United States Supreme Court has addressed an *ex post facto* challenge to a legislative amendment decreasing the frequency of parole suitability hearings wherein the prisoner argued that the *ex post facto* clause forbids any legislative change that has any conceivable risk of affecting a prisoner's punishment. In refusing to adopt that position, the Court stated:

> Respondent's approach would require that we invalidate any of a number of minor (and perhaps inevitable) mechanical changes that might produce some remote risk of impact on a prisoner's expected term of confinement. Under respondent's approach, the judiciary would be charged under the *Ex Post Facto* Clause with the micro management of an endless array of legislative adjustments to parole and sentencing procedures, including such innocuous adjustments as changes to the membership of the Board of Prison terms, restrictions in the duration of the parole hearing, restrictions on the time allotted for a convicted defendant's right of allocution before a sentencing judge, and page limitations on a defendant's objections to pre-sentence reports or on documents seeking a pardon from the governor. These and countless other changes might create some speculative, attenuated risk of affecting a prisoner's actual term of confinement by making it more difficult for him to make a persuasive case for early release, but that fact alone cannot end the matter for ex post facto purposes.

*Morales*, 514 U.S. at 508-09, 115 S. Ct. at 1602-03.

The United States Court of Appeals for the Sixth Circuit has also considered the issue of whether legislative changes in parole procedures, including a decrease in the frequency of parole hearings and an increase in the number of members on the parole board, violated the *ex post facto* clause and held:

> Changes in the number of Parole Board members is a procedural matter and does not implicate *ex post facto* protections. *Collins*, 497 U.S. 37, 45; *Miller v. Florida*, 482

U.S. 423 (1987). Furthermore, under the *Morales* test, Petitioner has not demonstrated how the change in the size of the parole Board creates a sufficient risk of increasing his punishment. The 1992 amendments do not increase the Petitioner's burden to qualify for parole. The parole guidelines remain essentially constant. Mich. Comp. Law Ann. § 791.233e. Thus, Petitioner has no greater substantive burden in convincing six members than in convincing three members, as long as the same standards apply.

*Cummings v. Burt*, 121 F.3d 707, 1997 U.S. App. LEXIS 21060, at *7-*8 (6th Cir. Aug. 4, 1997).

Mr. Phifer also asserts that the application of a 1998 amendment to Tenn. Code Ann. § 40-28-105(d)(3) requiring four (4) rather than three (3) votes to approve parole for certain offenses, including rape, is an *ex post facto* application of the law and not permissible. Specifically, he argues that this change imposes a harsher and retroactive application of laws to his parole release. In *Harris v. Traughber*, No. M2000-01146-COA-R3-CV, 2001 Tenn. App. LEXIS 490 (Tenn. Ct. App. July 13, 2001) (no Tenn. R. App. P. 11 application filed), this court considered the same issue and, relying on *Miller*, *Morales*, and *Cummings*, held that the 1998 amendment did nothing to change the standard for parole.

A procedural policy on the number of votes required to approve parole does not increase the punishment for a crime and, therefore, does not implicate *ex post facto* considerations. In addition, Mr. Phifer's parole was denied unanimously. He did not receive one vote, much less three, in favor of a grant of parole. Thus, he has not alleged that his denial of parole was affected by the change from three (3) votes to four (4).

We affirm the trial court's holding that Mr. Phifer failed to state a claim for relief based on the *ex post facto* prohibition.

III.

The heart of Mr. Phifer's complaint stems from his detention out of state and its effect on the procedures used by the Board. In particular, he objects to being subject to "non-appearance" hearings.

We begin with the statutory provisions governing how the Board may conduct its review for a grant of parole. Tennessee Code Annotated § 40-28-105(d)(2) states:

The chair of the board may designate individual members of the board of probation and parole and appoint hearing officers who shall be authorized to conduct hearings, take testimony and make proposed findings of fact and recommendations to the board regarding a grant, denial, revocation or rescission of parole. Such findings and

8

recommendations shall be reduced to writing and reviewed by board members who shall adopt, modify or reject the recommendations.[7]

Thus, the statutes make clear that the "hearing" may, in fact, consist of an interview with one Board member or a hearing officer. Other information considered by the Board includes records regarding the prisoner's offense, institutional record, and any other information the Board determines is relevant. The statutes indicate a legislative priority on accurate and comprehensive records for the Board. *See, e.g.*, Tenn. Code Ann. § 40-28-106(d)(1) (directing the Board and the division of inmate records to "identify the types of information necessary to enable the board to properly assess inmates being considered for action by the board").

Board Policy # 501.30 addresses parole release hearings, perhaps more appropriately called interviews. The policy provides for a personal interview for instate prisoners to allow the hearing officer or board member to address the prisoner's "history, current situation, parole prospects and any other pertinent matters. The inmate shall be given ample opportunity to express his/her views and present relevant materials." Additionally, the inmate's friends, family, attorney, or those of the victim are allowed to "speak and/or present written information for consideration within the time limits set by the Board Members or Hearing Officer."

The Interstate Corrections Compact provides, "The fact of confinement in a receiving state shall not deprive any inmate so confined of any legal rights which the inmate would have had if confined in an appropriate institution of the sending state." Tenn. Code Ann. § 41-23-102, Article 4(e). However, the Compact also specifically addresses "hearings."

> Any hearing or hearings to which an inmate confined pursuant to this compact may be entitled by the laws of the sending state may be had before the appropriate authorities of the sending state, or of the receiving state if authorized by the sending state.

Tenn. Code Ann. § 41-23-102, Article 4(f).

The Board's policy addresses "hearings in absentia" and includes a specific provision for prisoners housed out of state:

---

[7]Mr. Phifer also claims the meeting resulting in the denial of his parole was held in secret and no minutes were kept, contrary to Tenn. Code Ann. § 40-28-105(b) and administrative policy 501.30, stating that parole hearings are open to the public. The Tennessee Supreme Court addressed this issue in *Arnold v. Tennessee Bd. of Paroles*, 956 S.W.2d 478 (Tenn. 1997). The prisoner in *Arnold* alleged that his parole hearing was held in secret and no minutes were kept in violation of the Open Meeting Acts, Tenn. Code Ann. § 8-44-101 *et seq.*; Tenn. Code Ann. § 40-28-105 and the Open Parole Hearings Act, Tenn. Code Ann. § 40-28-501 *et seq.* The court explained "the Board's enabling statute does not require a meeting in order to deliberate or make parole decisions." *Arnold*, 956 S.W.2d at 480. Furthermore, the hearing summary sheet in which each board member signed off to agree, modify or disagree with parole equated to a public ballot or roll call vote. *Id*. at 481-82. The only record required to be kept of the board's decision making process is the hearing summary form which Mr. Phifer received stating the names, decision and reason of each member's decision. The fact that board members reviewed the contents of the file at different times did not violate any statute or procedure.

9

No offender shall be denied parole or given a deferment unless a personal hearing is held before the parole authority. However, in cases in which an inmate is serving a Tennessee sentence in another State or in a Federal institution, the parole authority shall request that the detaining jurisdiction provide a status report on the inmate's institutional history, conduct and progress. The Board may request a courtesy hearing from the authority in the detaining jurisdiction. All information received will be considered by the Board in a non-appearance review. The Board Operations staff shall enter the results of that review onto the computerized data base and shall send to the inmate a written copy of the results so that it is received by the inmate within twenty-one (21) days of the review.

Board of Paroles Policies and Procedures # 501.30(IV)(C).

Thus, the Board's policy provides different procedures for prisoners housed out of state from those housed instate in one regard. The nature of the interview or hearing is different. As the Board describes it in its brief, the rules "provide for an administrative review, not an in-person parole hearing in Tennessee" for those prisoners housed out of state. Mr. Phifer argues that this difference constitutes a violation of the right to equal protection of the law.

The Tennessee Constitution's equal protection provisions confer "essentially the same protection" as the equal protection clause of the United States Constitution. *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 152 (Tenn. 1993). Equal protection requires that persons similarly situated be treated the same under the law, or that the state treat persons under like circumstances and conditions the same. *Genesco, Inc. v. Woods*, 578 S.W.2d 639, 641 (Tenn. 1979), *superseded on other grounds by Combustion Eng'g, Inc. v. Jackson*, 705 S.W.2d 655 (Tenn. 1986); *Jaami v. Conley*, 958 S.W.2d 123, 126 (Tenn. Ct. App. 1997). Nevertheless, "[t]he Fourteenth Amendment guarantees equal laws, not equal results." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273, 99 S. Ct. 2282, 2293 (1979), *aff'd*, *Feeney v. Personnel Adm'r of Mass.*, 445 U.S. 901, 100 S. Ct. 1075 (1980).

Equal protection challenges are based upon governmental classifications. The classic analysis for such challenges involves the application of differing standards depending upon the effect. That analysis requires strict scrutiny only when the classification interferes with a fundamental right or operates to the peculiar disadvantage of a suspect class. *State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994). The standard of reduced scrutiny applies in other situations,[8] requiring only that a rational basis exist for the classification, or that the classification have a reasonable relationship to a legitimate state interest. *Id*.

[U]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions

---

[8]In *Tester*, our Supreme Court confirmed the existence of a middle standard of "heightened" scrutiny, but the case before us does not fall within those situations justifying such scrutiny. *Tester*, 879 S.W.2d at 828.

10

presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest.

*Wilson v. Yaklich*, 148 F.3d 596, 604 (6th Cir. 1998) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S. Ct. 2513 (1976)).

Because there is no right to parole and because prisoners housed out of state are not a suspect class, the differentiation in the types of interviews available is permissible as long as even a rational basis can be shown for the difference. *Id.*; *see also Mayner v. Callahan,* 873 F.2d 1300, 1309 (9th Cir. 1989) (stating that prisoners are not a suspect class and parole consideration is not a fundamental right requiring strict scrutiny). The Tenth Circuit has considered the same issue as that raised by Mr. Phifer herein in *Fox v. Stotts*, No. 99-3231, 2000 U.S. App. LEXIS 1017 (10th Cir. Jan. 27, 2000), wherein a Kansas prisoner serving his sentence in a Florida correctional facility pursuant to the Interstate Corrections Compact alleged that the Kansas parole board violated his right to equal protection by preventing his personal appearance at his parole hearing. The court found that the costs and difficulties of transporting prisoners provided a rational basis for the classification. *Id.* 2000 U.S. App. LEXIS 1017, at *7.

Herein, the Board argues that out of state prisoners are treated substantially the same and a rational basis exists for the differential treatment, a fiscal one. We agree.

Whether in or out of state, the initial hearing is for the purpose of providing the prisoner an interview by a hearing officer to gather information about the prisoner's history, progress, parole prospects and any other pertinent information. That interview was conducted by Florida corrections officials and its results forwarded to the Board. Additionally, there is no guarantee for other interested parties, i.e., family, friends or counsel, to be heard at the hearing. There is only a provision that they are allowed to submit information regarding the grant of parole. Mr. Phifer was provided notice of the review and was allowed to present any information or statements he felt relevant to the parole decision five days prior to the hearing. Thus, he had the opportunity to present statements from himself or any other person in support of the grant of parole. The fact that these statements must be in writing does not substantially disadvantage his request for early release on parole.

Furthermore, the Board has provided a rational basis for the difference in the nature of the hearings or interviews for out of state prisoners: the cost and difficulties involved in transporting prisoners for an in-person interview. Therefore, we agree with the trial court that no equal protection violation exists as to the differences in the way parole considerations are conducted for in and out of state prisoners.

11

## IV. Access to Legal Materials

Next, Mr. Phifer claims that he was denied meaningful access to the courts in that he was denied requested legal materials including Tenn. Code Ann. Titles 39 and 40 as well as the Board's 1979 Rules and Regulations that he sought in preparation for parole proceedings. Although it is not entirely clear, we interpret Mr. Phifer's pleadings and brief as raising the denial of access claim as part of his equal protection claim. That is, because he is housed in a Florida facility he does not have as ready access to Tennessee legal materials as those prisoners housed in prisons in Tennessee.[9]

Mr. Phifer began requesting materials in May of 1998 for the purpose of assisting him with his administrative appeal of the denial of parole. His filings and attachments show various efforts to obtain materials from both the Board and the Department of Correction.[10] On appeal Mr. Phifer states in his brief that he received "some of the legal materials" but only after a "deadline." Although the record is not totally clear on the issue, it appears that Mr. Phifer did obtain the Board's rules and procedures and those portions of Title 40 of Tennessee Code Annotated relating to parole. The majority of his continuing complaints have to do with materials reflecting the law in existence at the time of his crime which he asserts are related to his *ex post facto* claim.

### A. Constitutional Right of Access to Courts

The Supreme Court of the United States recognizes the existence of a constitutional right of access to the courts and has identified the sources of the right of access in the prisoner context as the Due Process Clause, the Equal Protection Clause, and the First Amendment.[11] *John L. v. Adams*, 969 F.2d 228, 231 (6th Cir. 1992). *See also Murray v. Giarratano*, 492 U.S. 1, 109 S. Ct. 2765 (1989); *Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491 (1977); *Wolff v. McDonnell*, 418 U.S. 539, 94 S. Ct. 2963 (1974); *Johnson v. Avery*, 393 U.S. 483, 89 S. Ct. 747 (1969); *Ex parte Hull*, 312 U.S. 546, 61 S. Ct. 640 (1941).

---

[9]The trial court treated the denial of access claim as part of Mr. Phifer's request for a writ of mandamus and held that mandamus was not appropriate because there existed no statute requiring respondents to provide him with the materials requested and mandamus lay only to enforce a ministerial duty.

[10]He first attempted to obtain legal materials directly from the Board on several occasions. The Board responded separately to these requests by stating that they were "unable to provide copies of this information" and "this office does not have the resources to provide specific volumes or titles of the Tennessee Code Annotated to offenders upon request." At that time, Mr. Phifer attempted to get the legal materials through an interlibrary loan. This request was evidently unsuccessful because shortly thereafter, a letter from Mr. Phifer to the Director of Board Operations appears in the technical record. In this letter, Mr. Phifer indicated that he never received the requested items through interlibrary loan and inquired about purchasing the materials from the Board. Mr. Phifer also contacted the Board's Hearing Director, the Appellate Review Section, and several employees of the Tennessee Department of Correction in his attempts to secure Tennessee legal materials.

[11]*But see Lewis v. Casey*, 518 U.S. 343, 364-85, 116 S. Ct. 2174, 2186-2196 (1995) (Thomas, J. concurring) (questioning the constitutional underpinnings of a right to assistance in litigation).

The landmark case in the area of a prisoner's right of access to the courts is *Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491 (1977). Prior to *Bounds*, it was settled that a state could not impede a prisoner's access to courts. In *Bounds*, a prisoner challenged the adequacy of the only state prison law library in North Carolina that serviced seventy-seven prisons. North Carolina argued that unless it obstructed the inmates from pursuing their claims, it was fulfilling the requirement that the inmates be given meaningful access to the courts.

The United States Supreme Court explained that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers . . . ." *Id.* 430 U.S. at 828, 97 S. Ct. at 1498 (footnote omitted). The decision in *Bounds* imposed an affirmative duty on states to assist inmates in gaining access to the courts by stating that states must "shoulder affirmative obligations to assure all prisoners meaningful access to the courts." *Id.* 430 U.S. at 824, 97 S. Ct. at 1496. The Court further explained that access must not only be meaningful, but adequate and effective, providing a "reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts," *Id.* 430 U.S. at 822, 97 S. Ct. at 1495, and noted some of the options of individual states in accomplishing this duty as providing access to a law library, hiring lawyers on a full- or part-time basis, and using law students, paralegals, or volunteers from the legal community to assist and advise prisoners.

## B. The Scope of the Right

The right to meaningful access to the courts ensures that prison officials may not erect unreasonable barriers to prevent prisoners from pursuing all types of legal matters. *Schrier v. Halford*, 60 F.3d 1309, 1313 (8th Cir. 1995); *John L.*, 969 F.2d at 235. The scope of the affirmative duty enunciated in *Bounds*, however, has been the subject of further litigation which has served to limit and define the types of litigation to which the duty applies. The beginning point for the analysis has been the language of *Bounds* itself.

> In Bounds, the Supreme Court noted that prisoners must be afforded meaningful access in their criminal trials, on their appeals as of right, and in their habeas and civil rights actions. In holding that the right to affirmative assistance applies in these contexts, the Supreme Court explained 'we are concerned in large part with original actions seeking new trials, release from confinement, or vindication of fundamental civil rights. . . . Habeas corpus and civil rights actions are of 'fundamental importance . . . in our constitutional scheme' because they directly protect our most valued rights.'

*Schrier*, 60 F.3d at 1311 (citations omitted).

In *John L.*, the Sixth Circuit held that it would be "an unwarranted extension of the right of access" to require states to affirmatively assist prisoners on civil matters arising under state law." 969 F.2d at 235-36. Similarly, in *Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992), the Sixth Circuit held that the right of access to the courts requires affirmative assistance for inmates "only in

13

the preparation of legal papers in cases involving constitutional rights and other civil rights actions related to their incarceration."[12]  *See also Reinholtz v. Campbell*, 64 F. Supp. 2d 721, 730 (W.D. Tenn. 1999) (quoting *Knop v. Johnson*, 977 F.2d at 1009).

The United States Supreme Court adopted a similar interpretation of *Bounds,* limiting the types of actions in which any affirmative duty of assistance exists, in *Lewis v. Casey*, 518 U.S. 343, 355, 116 S. Ct. 2174, 2182 (1996), when stating:

> The tools it [*Bounds*] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

The Court in *Lewis* also found that *Bounds* did not create any independent right of access to legal materials. The Court specifically found that *Bounds* did not establish a right to a law library or to legal assistance,[13] but that "[t]he right that *Bounds* acknowledged was the (already well-established) right to access to the courts." 518 U.S. at 350, 116 S. Ct. at 2179. Meaningful access to the courts is the touchstone. It is the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts that is protected, not "the capability of turning pages in a law library." 518 U.S. at 356-57, 116 S. Ct. 2182.

Most significantly, however, the Court in *Lewis* emphasized that a claim based on denial of access to the courts carries a requirement of actual injury.

> The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents a court of law from undertaking tasks assigned to the political branches. It is the role of the courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution. . . . But the distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly. If – to take another example from prison life – a healthy inmate who had suffered no deprivation

---

[12]In *Knop*, the court concluded that if citizens who were not incarcerated had no right of access to the public purse for legal assistance to pursue or defend all types of legal claims, incarceration would not create such a right. 977 F.2d at 1009.

[13]The court stated that *Bounds* no more established such a right to legal assistance or material than *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976) established a right to a prison hospital. *Lewis*, 518 U.S. at 350, 116 S. Ct. at 2179.

of needed medical treatment were able to claim violation of his constitutional right to medical care simply on the ground that the prison medical facilities were inadequate, the essential distinction between judge and executive would have disappeared: it would have become the function of the courts to assure adequate medical care in prisons.

*Id.* 518 U.S. at 349-50, 116 S. Ct. at 2179 (citations omitted).

The injury must relate to the right of access to the courts. That is, the fact that a prison law library is without some materials does not establish an actual injury. The inmate must demonstrate that the alleged shortcomings hindered his efforts to pursue a legal claim. 518 U.S. at 351, 116 S. Ct. at 2180. Essentially, the inmate must show that a nonfrivolous legal claim relating to his sentence or the conditions of his confinement has been frustrated or is being impeded in order to demonstrate an injury in fact resulting from denial of the right of access to courts. 518 U.S. at 353-55, 116 S. Ct. at 2181-82.[14]

## C.  No Denial of Access to Courts

Applying these principles to Mr. Phifer's claim, we begin with his assertion that he was denied, at least for a while, materials necessary to present his position to the Board for consideration in its determination whether to grant him parole. Because the Board is an administrative agency, not a court, the right of access to courts is not implicated. Mr. Phifer was given the opportunity to present in writing any information he wanted the Board to consider. The Board's decision was based upon the nature of the offense for which he was convicted and sentenced and its discretion to determine that his release at that time would diminish the seriousness of that offense. Therefore, he cannot show that his lack of access to materials resulted in denial of his parole or in his ability to present information to the Board. We also note that he acknowledges that he received the Board's policies and instructions on how to present information. The Sixth Circuit has held that a prisoner's inability to present "legal" papers to a parole board did not interfere with his access to the courts, finding that parole release was discretionary with the board and that parole hearings were non-adversarial and did not require "legal" filings. *Favors v. Koehler*, 786 F.2d 1164 (6th Cir. 1986); *see also Reinholtz*, 64 F. Supp. at 730 (holding that according to *Bounds* and its progeny the right of access to courts for prisoners is limited to filing cases in court, not in filing grievances). As the Supreme Court made clear in *Lewis*, it is denial of the capability to bring challenges to the courts which is the touchstone of the right claimed by Mr. Phifer.

Although Mr. Phifer's pleadings and briefs refer to his efforts to obtain requested legal materials during the administrative appeals of the denial of his parole, a liberal reading of those

---

[14]The Supreme Court gave as examples of actual injury in fact as a showing that a complaint prepared by the inmate was dismissed for failure to satisfy some technical requirement which he could not have known because of deficiencies in the assistance provided by the prison or that "he was so stymied by the inadequacies of the law library that he was unable to even file a complaint." 518 U.S. at 351, 116 S. Ct. at 2180.

15

papers indicate he also wanted the materials necessary to challenge an anticipated Board denial of parole in a separate civil action in court. *Lewis* teaches that, in order to save his access to courts claim from dismissal, Mr. Phifer must have alleged that he suffered actual injury with regard to that litigation; that his claim was nonfrivolous and was within the scope of the right to affirmative assistance; and that he was hindered in presenting his claim to the courts.

Mr. Phifer cannot show that he was denied access to courts or any injury resulting from such denial. His petition in the trial court was not lost or dismissed for failure to comply with a technical requirement; he does not claim that he missed a statute of limitations or was unable to prepare or file a complaint. Both the trial court and this court have given full consideration to the issues raised by Mr. Phifer. He has not been denied access to the courts. "No actual injury occurs without a showing that such a claim [challenging the conviction or conditions of confinement] 'has been lost or rejected, or that the presentation of any such claim is currently being prevented.'" *Reinholtz*, 64 F. Supp. at 730 (quoting *Lewis*, 518 U.S. at 356, 116 S. Ct. at 2182). Mr Phifer has not alleged sufficient facts to show that the alleged unavailability of the materials he requested hindered his efforts to pursue a legal claim. *Sanders v. Campbell*, No. 02A01-9810-CV-00299, 1999 Tenn. App. LEXIS 749, at *10 (Tenn. Ct. App. Oct. 30, 1999) (no Tenn. R. App. P. 11 application filed) (quoting *Lewis*, 518 U.S. at 351, 116 S. Ct. at 2180 (1996)).

Further, as evidenced by Mr. Phifer's brief, he eventually received portions of the materials requested, and his filings in the trial court and in this court demonstrate an ability to clearly state his complaint and a basic knowledge of the law of due process, equal protection, and *ex post facto* application of laws. Therefore, even if access to legal materials were a protected right, we can find no indication that his case was hindered by the alleged unavailability of some materials. *See State of Tennessee v. Goodwin*, 909 S.W.2d 35, 43 (Tenn. Crim. App. 1995).

Finally, we note that a court challenge to a Board decision to deny parole is not an attack on the sentence or a challenge to the conditions of confinement. Because a prisoner has no right to early release on parole prior to the expiration of his sentence, parol board decisions do not implicate a fundamental right. Thus, Mr. Phifer's challenge to the Board's decision to deny him parole is not within the scope of the affirmative duty to provide meaningful access to the courts under *Lewis*.[15]

---

[15]Nonetheless, we caution the State defendants regarding their duty to provide access to the court to Tennessee prisoners or those convicted in Tennessee but housed in another state. In *Phillips v. Mills*, 1999 U.S. App. LEXIS 20628 (6th Cir. Aug. 25, 1999), the Sixth Circuit granted relief to a prisoner who had missed a critical deadline to challenge his Tennessee conviction because he was housed in Alabama and had no access to Tennessee legal materials. He had been extradited from Alabama for trial and returned immediately thereafter to finish serving an Alabama sentence. He was told by Alabama officials, "The State of Alabama is not obligated to supply you with legal assistance in order to attack your convictions in the State of Tennessee. You will have to be returned to Tennessee before attacking your convictions." That return came after the expiration of his time to file a petition for post conviction relief. The Sixth Circuit found that the circumstances established cause for his procedural default in failing to file a timely petition. 1999 U.S. App. LEXIS 20628, at *11. The court found it unnecessary to determine which state had the duty to provide the prisoner with the required legal materials, and cited authority for each position. 1999 U.S. App. LEXIS 20628, at *12 n.4. We are not called upon to make that decision either, but note that Mr. Phifer is in Florida under the Interstate

(continued...)

## V. Conclusion

The decision to grant parole is a discretionary matter that rests with the Board. *Doyle v. Hampton*, 207 Tenn. 399, 401, 340 S.W.2d 891, 892 (1960). Whether to grant parole is a decision for the Board, not the courts. Absent a failure of the Board to act in a lawful and constitutional manner, courts can grant no relief from denial of parole.

For the foregoing reasons, we affirm the dismissal of Mr. Phifer's petition for failure to state a claim upon which relief may be granted. Costs of this cause are taxed to Mr. Phifer, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE

---

[15](...continued)
Corrections Compact as a Tennessee prisoner and, unlike the inmate in *Phillips*, is confined there solely because of his Tennessee conviction.